Affirmed and Memorandum Opinion
filed November 17, 2009.  

 

In
The

Fourteenth
Court of Appeals



NO. 14-09-00136-CV



 

In the Interest
of M.G., Appellant 

 



On Appeal from
the 306th District Court

Galveston County, Texas

Trial Court
Cause No. 07CP0045



 

MEMORANDUM OPINION


            Appellant,
“Jane Doe,” appeals from the termination of her parental rights to M.G. based
on trial court findings that:  (1) appellant failed to comply with provisions
of the court’s prior orders establishing actions necessary for the return of
the child after removal for abuse or neglect, and (2) termination was in the
child’s best interest.  On appeal, appellant contends that there was legally
and factually insufficient evidence to support the court’s findings and that
she received ineffective assistance of counsel.  We affirm.

I. 
Background

            M.G.
was born on July 12, 2005.  The current case involving M.G. was initiated on
May 3, 2007, when the Texas Department of Family and Protective Services
(TDFPS) filed a Petition for Order to Participate in Services.  At one point, M.G.
was placed with appellant’s aunt.  When the aunt returned the child to
appellant, TDFPS took custody of M.G. on an emergency basis.  TDFPS filed a
petition to terminate appellant’s parental rights, and the final trial ensued.  At
the time of trial, January 12, 2009, M.G. was three and a half years old.

Robin
Slusher, a family-based safety supervisor with TDFPS, testified that M.G.’s
case had been referred to her unit by a member of the TDFPS investigative
unit.  According to an affidavit by Saralynn Harris with TDFPS, which was filed
as an exhibit, the investigative unit received an “intake report” alleging
mental and physical neglect of M.G.  During a subsequent telephone call with
someone from TDFPS, appellant expressed concern about M.G.’s twin, although M.G.
did not have a twin; meanwhile, M.G. could be heard “screaming and crying in the
background [and appellant] was unconcerned.”

            On
January 31, 2007, Harris visited appellant’s residence, where she saw three
children but was not permitted to see M.G.  Appellant complained about things
that happened at the hospital when M.G. was born, stated that the hospital lied
about her, and said that she was not taking any medications.  When Harris
finally saw M.G. three days later, he appeared healthy and was dressed
appropriately for the weather.  During a February 1, 2007 visit, appellant told
Harris that M.G’s twin had been abducted, that her (appellant’s) mother was
“using crack” and had tried to “get” M.G., and that when M.G. went to be
immunized, the needle was “full of mercury,” causing him to stop breathing and
begin convulsing.  Harris asked appellant to sign a family safety plan, but
appellant became “very agitated” and refused.

            Harris
further states in the affidavit that two prior cases had been filed concerning
appellant’s children.  The first case was initiated when appellant refused to
permit a blood transfusion for M.G. soon after he was born on the grounds that
she was a Jehovah’s Witness.  This case resulted in M.G.’s being in State
custody from July 14, 2005, until January 2006. The second case was initiated
when appellant failed to appear for “well baby” checkups.  The second case
apparently did not result in M.G.’s entering state custody.

            Two
additional reports came into TDFPS in March 2007.  The reports involved
appellant’s continued allegations of a conspiracy concerning a twin of M.G. as
well as a charge that someone had poisoned M.G.  When Harris and an
investigator visited appellant on April 20, 2007, appellant told them that two
men who worked in a store had put something in M.G.’s mouth.  Appellant also
said that M.G. received a shot with mercury in it at the hospital and that
someone told her afterwards that it had ricin, a dangerous toxin, in it.  A
person also reportedly told appellant that someone was sneaking into
appellant’s apartment at night, and one night an intruder supposedly stuffed a rag
in appellant’s mouth, causing her mouth to turn blue.

            According
to TDFPS supervisor Slusher, after the initial investigation, TDFPS sought a
court order compelling a mental health evaluation of appellant, protective
child care, and referral to the TDFPS Family Based unit.  This unit attempts to
resolve issues involving children by keeping the children with their families. 
On May 31, 2007, the trial court entered an order requiring appellant to, among
other things, complete a psychological evaluation and follow all
recommendations.[1]  On
August 15, 2007, a new report was called into TDFPS, stating that appellant had
been arrested for kicking out windows on a public bus while M.G. was with her. 
Appellant thereafter agreed to voluntarily place M.G. with appellant’s aunt. 
On August 30, 2007, the trial court entered a second “Order for Required
Services,” in which it again ordered a psychological evaluation and threatened
that if not performed by September 4, 2007, M.G. would be taken into State
custody.

            Robert
D’Angelo, a clinical psychologist, performed testing on appellant on September
6, 2007.  In his resulting report, D’Angelo noted that appellant “expressed
multiple delusions that became more paranoid and fantastic” as she attempted to
“clarify and explain herself.”  Among other claims, she asserted that Oprah
Winfrey was a relative of hers who spoke to her through a television show. 
D’Angelo concluded that appellant’s “thinking is severely distorted by paranoid
delusions” and that her “psychotic thought processes . . . likely place [M.G.]
at high risk for exposure to dangerous situations.”  He warned that appellant’s
“paranoid concerns” might prevent her from seeking medical attention for M.G.
when required or from enrolling him in school.  He further suggested that
appellant’s delusions could be detrimental to M.G.’s emotional development as
he matured.  D’Angelo urged that appellant “receive a psychiatric evaluation in
order to determine if she would benefit from treatment with psychotropic
medications.”  D’Angelo also noted in his report that appellant “greatly cares
about” M.G. and has positive thoughts and feelings about her maternal role.  However,
appellant “showed no insight into her difficulties or a need for treatment,”
and did not perceive a need for medication.

According to Slusher, based on D’Angelo’s evaluation,
TDFPS determined to take custody of M.G.  Slusher explained that she first
received an oral report concerning D’Angelo’s assessment and that the pleading
seeking custody of M.G. was filed with the court before receipt of D’Angelo’s
written report.  After the pleading seeking custody was filed, Slusher’s
family-based TDFPS unit turned the case over to the “subcare” unit.  Slusher
stated that she believed TDFPS took custody of M.G. on September 4, 2007.  This
date is also mentioned in an affidavit by Delores Martin, whom Slusher
supervised.  Martin stated that on September 4, she was notified that M.G.’s
voluntary placement caregiver (appellant’s aunt) had a family emergency and
could no longer care for M.G.  Martin subsequently received an oral report from
D’Angelo that it would not be safe to return M.G. to appellant until she had
received a psychiatric evaluation at which she could be prescribed medication. 
According to Martin, it was then decided that M.G. should be taken into State
custody.  When asked, Slusher was unable to explain a glaring timing
discrepancy:  how Martin supposedly received an oral report from D’Angelo on
September 4, 2007, and the State took custody of M.G. on that same day, when
the date of the psychological evaluation, as indicated in D’Angelo’s report and
testimony, was September 6, 2007.

A Family Service Plan was drafted on September 18,
2007.  According to Slusher, this document outlines the services that a parent
is expected to complete before a child in State custody can be returned to the
parent.  The requirements are intended to be incorporated into the court’s
orders.  Under the September 18 plan, appellant was required to have supervised
visitation with M.G., complete a psychiatric evaluation, and follow all resulting
recommendations, including taking medication if prescribed.  The plan further
calls for appellant to follow all TDFPS recommendations, refrain from criminal
activity, demonstrate an ability to develop supportive relationships, and
cooperate with “agency, providers and worker.”  On September 27, 2007, the
court entered additional orders again requiring that appellant “complete a
psychiatric and follow all recommendations, including taking any prescribed
medications.”  At the conclusion of her testimony, Slusher stated that
appellant’s mental state did not allow her to parent M.G. and that termination
of appellant’s parental rights was in M.G.’s best interest.

Appellant testified that she “took Abilify for mild depression”
as prescribed by a “doctor at Saint Vincent from UTMB.”  She said that she saw
that doctor after her son was taken by TDFPS for the second time, and she
learned that he had been “beat up and abducted” while in their custody.  She
said that she refilled the prescription “off and on.”  Appellant further
asserted that a clinic in Houston also evaluated her and placed her on a low
dose of Abilify for depression, but she could not recall the clinic’s name. 
She said that she had brought a slip of paper and the medication to court for a
prior hearing but that some of her paperwork had been destroyed during
Hurricane Ike.  She further stated that the only medication she takes is Abilify,
which she said she was told to take three times a week:  Monday, Tuesday, and
Wednesday.  She said that she takes it when she feels depressed, as the doctor
told her to do.  The dosage had to be lowered at some point because it was
making her sleep too much and because she was experiencing heart palpitations,
high blood pressure, and headaches.

            Appellant
further testified that she had been a world class track athlete and once had
“the fastest time in the nation in the hundred meters.”  She also asserted that
she had “worked for almost every company in America security [sic],” and once
foiled an assassination attempt on San Francisco Mayor Willie Brown.  At one
point, they wanted her to provide security for President Clinton’s California
home while he was president, but she needed to return to Texas to care for her
mother.  She said that she had been a foster mother for three boys, worked at
three different daycares, and worked at “the Sequoias . . . a retirement home
for the elderly judges, lawyers, and doctors.”  Appellant additionally
maintained that she “wrote songs for various artists,” including Beyonce, and
that she was both listed in the Encyclopedia Britannica and had appeared in a
health film produced by that company.  Appellant recounted seeing someone put
something in M.G.’s mouth at a store, after which he contracted high fever and
had seizures.

            When
asked about the requirement in 2007 that she obtain psychological and
psychiatric evaluations, appellant stated “I got my evaluation from the CPS
[Child Protective Services, a division of TDFPS].  They did the evaluation. 
CPS did the psychological, psychiatric evaluation of November 2005 or November
2006, and the other psychiatric and psychological always came from the CPS.” 
When she asked for assistance regarding medications, appellant said that she
was told that she “could do it on [her] own.”

            Appellant
stated that she always tried to make her visitations with M.G. but sometimes
she would be about fifteen minutes late.  She said that for about three months
when she visited, M.G. would not be there.  She was also told by someone who
works at the Children’s Crises Center that M.G. had been “found with some man
and he was beat up, and whoever had him tried to kill him.”  TDFPS employee Sean
Brewster was allegedly one of the people who said M.G. had been beaten.  Appellant
said that she knows M.G. “was beat up and abducted while in CPS custody.”  A
woman in one of her parenting classes suggested it was someone named “Atamus”
who harmed M.G.  She said that she confronted this man, and he did not deny
it.  She also acknowledged that she had complained to the police that Brewster himself
had beaten M.G.

            Appellant
feels that she is capable of taking care of M.G. because she helped her mother raise
nine kids.  She said that she has never missed a visit and has attended every
court hearing.  She further asserted that she completed psychological and
psychiatric examinations and took all the prescribed medication.  She said that
she has the support of the members of her church, and she maintains a clean and
safe home.

            On
December 6, 2007, Dr. Ignacio Valdes, performed a psychiatric assessment of
appellant.  Valdes concluded that appellant suffered from a delusional
disorder, and his report recounts some of the same apparent delusions appellant
told to Dr. D’Angelo.  Valdes further stated that appellant “is quite
delusional and is likely unable to carry out the duties of caring for her son
at this time.”  In the report, Valdes additionally noted that appellant was
taking 15 mg of Abilify daily, suggests that the drug “may be helping her,” and
recommends continuing the “anti-psychotic” and perhaps increasing the dosage. 
Dr. D’Angelo, the psychologist, testified that he is “[s]omewhat” familiar with
Abilify and that it is an antipsychotic medication that needs to be taken on a regular,
i.e., daily, basis in order to be beneficial, and not on an as-needed
basis.  A second psychiatric report also appears in the record, apparently from
Saint Vincent’s Episcopal House.  This report, dated October 11, 2007, is
handwritten and not entirely legible.  It mentions appellant’s having grandiose
and delusional ideations.  It further indicates that appellant received a one-month
supply of Abilify 15 mg, and says that appellant was told to return in one
month.  A separate page logs a visit by appellant to the facility on February
14, 2008, at which appellant apparently sought a refill of her medicine.  The
note suggests that she was then told to make an appointment, and it does not
show that she received a refill.

D’Angelo
further testified that patients are sometimes given a particular medication on
a trial basis and may receive a prescription for the medication once it is
determined how well the medication works for that patient.  D’Angelo stated
that if appellant was not currently being seen by a psychiatrist or under a
current regimen of medications, he would still believe appellant was dangerous
for M.G. to be around, perhaps even more so because M.G. was older at the time
of trial than he had been when D’Angelo wrote his report.  D’Angelo further explained
that even supervised visitation with appellant could be detrimental to M.G.
because of the possibility she could make delusional statements.  D’Angelo
acknowledged that he was not a psychiatrist and could not himself dispense
medication.  He further acknowledged that he had never spoken to Dr. Valdes, or
anyone at St. Vincent’s, about appellant’s case.

            Sean
Brewster testified that he is a TDFPS substitute care worker, whose duties
include developing family service plans and monitoring children while they are
in foster care or placed with relatives.  He was assigned to monitor M.G. and
visited him every month.  He reported that when he first began visiting M.G.,
when M.G. was a little over two years old, the child was ”very delayed” and
“didn’t really speak at all.”  During the over-a-year period that M.G. had been
in foster care, he had shown definite improvement and was “catching up” to age
level.  Although M.G. was initially placed with a relative during the
investigative phase of the case, he was subsequently placed with a foster
family and has remained with that family since.  TDFPS performed a home study
in anticipation of placing M.G. with appellant’s sister, but the sister
declined placement.  The sister told Brewster that she had made her decision
based on appellant’s instability, accusations, and threats about calling the
police.

            Brewster
stated that when appellant came to his office, he would talk to her about her
visitations with M.G. and her needing to be on medication.  He said that he
observed her visitations with the child and “quite a few times” saw things that
concerned him.  For example, at one visitation, appellant was treating M.G.
like a younger child by holding him under a blanket.  When she finally put him
down, M.G. hit appellant in the face and then crawled under a table.

            Brewster
felt that appellant had not complied with the family service plan or resulting
court orders in that she had not cooperated with him as directed in those
documents.  He said that she denies having mental health issues, does not see a
psychologist or psychiatrist regularly, and does not take her medication as
prescribed.  He further said that after visits, she made accusations of abuse
or neglect regarding M.G.  Brewster himself was accused of taking M.G. to his
house, using M.G.’s social security check to pay his house note, and sexually
molesting M.G.  At some point, appellant began making daily phone calls to
Brewster and leaving “rantings” on his voice mail.  He further accused
appellant of once having pulled the fire alarm at TDFPS offices.

            Brewster
additionally discussed the trial court’s permanency hearing order dated
February 21, 2008.  In part, this order required appellant to continue taking
her medication and “to either sign release or get written information from
Dr.”  Brewster testified that this requirement was included based on appellant’s
assertion that her doctor had told her that she did not have mental health
issues but had given her Abilify to take when she felt depressed.  According to
Brewster, the court order required appellant to obtain proof of her
assertions.  Brewster said that to his knowledge she has not complied with that
order and has never produced to him a prescription for medication or written
documentation from a psychiatrist.  Brewster acknowledged that TDFPS arranged
the examinations by D’Angelo and Valdes. 

            Brewster
said that M.G, is “doing really well” in his foster home and that the long term
plan is to have M.G. “adopted into a loving home.”  In his opinion, it is in
M.G.’s best interest to terminate appellant’s parental rights, and it would not
be safe to place M.G. back with appellant.  He said that he had not seen any
indication that appellant was “willing and able to seek help for herself,” and
he did not foresee that changing in the future.

            On
cross-examination, Brewster acknowledged that sometimes children born prematurely,
like M.G., have developmental delays.  Brewster further agreed that if
appellant obtained help for her mental illness, stayed on her medication, and
received support from her family, she might be able to parent M.G.  Brewster
emphasized, however, that appellant does not believe that she has a problem. 
Brewster was told by appellant’s sister at one point that the family was going
to try to get her some help, but Brewster never heard whether they did so.

            Debra
Ross testified that she is Brewster’s supervisor at TDFPS and that her duties
include making a determination regarding the best interest of the child in
particular cases.  She had regular contact with appellant during the pendency
of the case and expressed concern for M.G.’s safety around her.  Specifically, Ross
mentioned that appellant had called M.G. by another child’s name and had once
asked M.G. if he was enjoying the summer with his father when M.G. was actually
in foster care.  Regarding whether appellant’s parental rights should be
terminated, Ross pointed out that if TDFPS retained custody, but appellant’s
rights were not terminated, M.G. might “grow up in the system” and never
receive the stability of a permanent foster home or adoptive family.  She
further said that she did not see any prospects for placement with a family
member, despite attempts to find such a placement.

            Shabreena
Banks, a human service technician with TDFPS, testified that she had been responsible
for transporting M.G. during the year prior to trial.  She said that before
Hurricane Ike, appellant showed up for all of the visitations, even though she
would sometimes be as much as 30 minutes late.  Of the four scheduled
visitations post-Ike, which were at a different location, appellant visited
only once before M.G. had to be returned to his foster home.  Banks said that
she later learned that appellant eventually did appear for all of the post-Ike
visitations, although sometimes four to five hours late.

            Jill
Stevens, a Court Appointed Special Advocate case manager, testified that her
duties include case investigation, visiting the child monthly, and making sure
the placement for the child is acceptable.  She further stated that she had
been visiting M.G. monthly since August 2008.  She said that he has bonded with
his foster family, a father and two boys, and that he gets along very well with
them.  When she first began visiting M.G., “he wouldn’t talk at all,” but at
her latest visit, “he was a lot more talkative.”  M.G. said “I love you” to his
foster father “multiple times” during that visit.  At one point, Stevens talked
to appellant about why she (appellant) had missed several recent visits with
M.G.  Appellant would not answer Stevens’ questions on the matter except to say
that M.G. was being abused and that TDFPS was bringing a different boy to the
visits.  During this conversation, appellant also told Stevens that she hoped
Jehova would kill all employees of TDFPS.  Ultimately, Stevens recommended
termination of appellant’s parental rights based on her lack of stability and
because M.G.’s emotional and mental well-being would be at risk in her care.

            Appellant’s
aunt testified that M.G. had been placed in her home for about 45 days until
she had to attend to a family emergency in California.  At that time, she
returned M.G. to appellant.  She said that M.G. should be with appellant
because “that’s the natural thing for him,” and she asserted that she has shown
a willingness to help appellant.  The aunt further insisted that if the choice
were between having M.G. live with her or be adopted by a stranger, he could
live with her.  She stated that she had told TDFPS of her willingness to care
for M.G. for a short time but had never previously expressed a willingness to accept
a long-term placement.  She maintained that she would be able to provide a good
home for M.G. and would obey the court’s ruling if the court limited appellant
to only supervised visits with M.G.  She acknowledged having previously returned
M.G. to appellant even though she had been told not to do so.  She did so only
when appellant had completed everything that she had to do in order to have
M.G. returned.  Lastly, she said that appellant does not take her Abilify daily
due to heart problems but only takes the medication three times a week.

            Pursuant
to Texas Family Code § 161.001, the trial court terminated appellant’s parental
rights based on its findings that (1) appellant failed to comply with court
orders specifying actions necessary for the return of M.G. to appellant’s care
after removal for abuse or neglect, and (2) termination was in M.G.’s best
interest.[2]  Id.
§ 161.001(1)(O), (2).[3] 
On appeal, appellant contends that the evidence was legally and factually
insufficient to support the trial court’s findings on failure to comply,
removal for abuse or neglect, and best interest of the child.  She further
contends that she received ineffective assistance from her trial counsel.

II. 
Sufficiency of the Evidence 

A. 
Section 161.001(1)(O)

            In
her first issue, appellant contends that the evidence was legally and factually
insufficient to support the trial court’s finding, pursuant to section 161.001(1)(O)
of the Family Code, that she failed to comply with prior court orders
establishing actions necessary for the return of M.G. after removal based on
abuse or neglect.  This finding actually has two components:  a finding that
M.G. was removed for abuse or neglect and a finding that appellant failed to
comply with court orders.  We will discuss each finding in turn.

            In
conducting a legal sufficiency review in the parental rights termination
context, we examine all of the evidence in the light most favorable to the
finding, giving due deference to the factfinder’s conclusions and resolving
disputed facts in favor of the finding if a reasonable factfinder could have
done so.  In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002).  In conducting a
factual sufficiency review, we “give due consideration to evidence that the
factfinder could reasonably have found to be clear and convincing” and
“consider whether disputed evidence is such that a reasonable factfinder could
not have resolved that disputed evidence in favor of its finding.”  Id. 
The ultimate issue under both standards is whether a reasonable factfinder
could have formed a firm belief or conviction that the finding in question was
true.  Id.

1. 
Removal for Abuse or Neglect

            Appellant
first attacks the trial court’s finding that M.G. was removed from appellant’s
care due to abuse or neglect.  See In re A.A.A., 265 S.W.3d 507, 515
(Tex. App.—Houston [1st Dist.] 2008, pet. denied) (holding that removal for
abuse or neglect is a required element of proof for termination under section
161.001(1)(O)); see also In re S.N., 287 S.W.3d 183, 189-90 (Tex.
App.—Houston [14th Dist.] 2009, no pet.) (following In re A.A.A.).  Exactly
what constitutes “abuse or neglect” is not defined in the statute or by the
interpretive caselaw and must be determined on a case-by-case basis.  See In
re A.A.A., 265 S.W.3d at 515 (surveying cases).

Evidence
indicated that TDFPS had initiated two earlier cases involving appellant’s care
of M.G., one when appellant refused to permit a blood transfusion based on
religious grounds and another when appellant failed to appear for “well baby”
checkups.  The original “intake report” for the current case alleged appellant
was mentally and physically neglectful of M.G.  Shortly thereafter, in a
telephone conversation with a TDFPS worker, appellant expressed concern about M.G.’s
nonexistent twin while M.G. could be heard “screaming and crying in the
background [and appellant] was unconcerned.”  There was considerable evidence
in the record concerning appellant’s delusions, including several involving
perceived harm to M.G.  On February 1, 2007, appellant was asked to sign a family
safety plan, but appellant refused, becoming “very agitated.”  In March 2007,
two additional reports came into TDFPS, both concerning appellant’s apparent
delusions.  In August 2007, appellant was arrested for kicking out windows on a
public bus while M.G. was with her.  M.G. was then placed with appellant’s
aunt, but when the aunt had a family emergency, she subsequently returned M.G.
to appellant without court or TDFPS approval.  Dr. D’Angelo evaluated appellant
in early September 2007.  As a result, D’Angelo concluded that appellant’s
“thinking is severely distorted by paranoid delusions” and that her “psychotic
thought processes . . . likely place [M.G.] at high risk for exposure to
dangerous situations.”  He further warned that appellant’s “paranoid concerns”
might prevent her from seeking medical attention for M.G. or enrolling him in
school.  He additionally expressed concern that appellant’s delusions could be
detrimental to M.G.’s emotional development.  According to D’Angelo, appellant “showed
no insight into her difficulties or a need for treatment.”

In her testimony regarding the TDFPS decision to take
M.G. into state custody, Robin Slusher, a TDFPS supervisor, stated that they had
received an oral report concerning D’Angelo’s evaluation before making the
decision.  Slusher was unable to explain, however, how although she believed TDFPS
took custody of M.G. on September 4, 2007, in his report, D’Angelo listed the
date of the evaluation as September 6, 2007.  In her briefing to this court,
appellant points out that TDFPS could not have received, on September 4, an
oral report of an evaluation that did not occur until two days later.  She
further urges that this discrepancy is conclusive proof of fabrication by
Slusher and other TDFPS employees and that it taints all of the evidence
concerning M.G.’s removal and placement into state custody.  However, it would
have been entirely logical for the factfinder to have concluded that the
discrepancy was simply a result of a mistaken date, either on the part of
Slusher or on the part of D’Angelo.  We decline to disregard the State’s
evidence concerning the removal of M.G. based on appellant’s allegations of
fabrication on the part of TDFPS.

It should further be noted that evidence of events
occurring after removal also point to the abuse or neglect of M.G.  In
particular, the testimony from TDFPS employees that M.G. was developmentally
delayed and that appellant at times had difficulty interacting with him
corroborates the prior evidence concerning abuse or neglect.  While appellant points
out that the fact that M.G. was born prematurely may also have contributed to
his delay, there was sufficient evidence for the factfinder to ascribe at least
part of the cause to abuse or neglect.

Based on the foregoing evidence, a reasonable
factfinder could have formed a firm belief or conviction that M.G. was removed
due to abuse or neglect.  Accordingly, we find that the evidence was legally
and factually sufficient to support this finding.

2. 
Failure to Comply

            The
focus of the State’s case concerning failure to comply with court orders was on
appellant’s alleged failure to consistently take her prescribed medication.  As
discussed above, this requirement was included in several of the trial court’s
orders specifying appellant’s fulfillment of certain requirements before M.G.
could be returned to her care.  We find the evidence to be sufficient for a
reasonable factfinder to have formed a firm belief or conviction that the
finding in question was true.  See id.

The most direct evidence produced by the State
regarding whether appellant consistently took her medication was in the
testimony of Brewster, the TDFPS caseworker, who stated flatly that appellant had
not taken her medication as prescribed.  Although direct, such testimony was
conclusory, in that it did not provide a basis for Brewster’s knowledge in this
regard.  Appellant herself testified that she took Abilify three times a
week—Monday, Tuesday, and Wednesday—and otherwise as needed.[4]  Although
appellant testified that she was told to take the medication in this manner, as
sole judge of the credibility of witnesses, the factfinder was free to accept
as true appellant’s statement that she took the medication three times a week,
while rejecting her statement that three-days-on-four-days-off was the
prescribed method for taking the medication.  See Cain v. Pruett,
938 S.W.2d 152, 159 (Tex. App.—Dallas 1996, no writ).  Dr. D’Angelo, the
psychologist, testified that he was familiar with Abilify and that to be
effective, it had to be taken daily.  D’Angelo acknowledged, however, that as a
psychologist, he was unable to dispense medication himself.[5]  In his
report, Dr. Valdes, the psychiatrist, noted that appellant had been prescribed
Abilify to be taken daily.  In summary, there was evidence that Abilify must be
taken daily to be effective, that appellant was prescribed a daily dose of
Abilify, and that appellant only took Abilify three times a week.

            There
was also evidence from which the factfinder could have concluded that appellant
did not refill her Abilify prescription.  In the psychiatric report from Saint
Vincent’s Episcopal House, it is noted that appellant received a one-month
supply of Abilify and was told to return in one month.  A separate page from
St. Vincent’s appears to log a visit by appellant to the facility four months
later, at which time, appellant apparently sought a refill of her medicine. 
The note suggests that she was told she would need to make a new appointment,
and it does not indicate that she received a refill.  Appellant cites to no
evidence in the record, other than appellant’s testimony about a prescription
card, and our review has discovered none, indicating that she ever received a
refill of her Abilify prescription or any other medication for her mental
health issues.

            Based
on the foregoing evidence, a reasonable factfinder could have formed a firm
belief or conviction that appellant failed to comply with court orders
establishing actions necessary for the return of M.G. from State custody.  The
evidence was therefore legally and factually sufficient to support the
finding.  Accordingly, we overrule appellant’s first issue.

B.  Best Interest

            In
her second issue, appellant contends that the evidence was legally and
factually insufficient to support the trial court’s finding that termination
was in M.G.’s best interest.  Such a determination is required before parental
rights can be terminated pursuant to section 161.001(2) of the Family Code. 
Tex. Fam. Code § 161.001(2).  In reviewing the evidence on this termination
element, we keep in mind the strong presumption that a child’s best interest is
served by maintaining the parent-child relationship.  In re J.I.T.P., 99
S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (citing Tex.
Fam. Code §§ 153.131(b), 153.191, and 153.252).  In Holley v. Adams, the
Texas Supreme Court set forth a list of factors which courts have considered in
ascertaining the best interest of a child.  544 S.W.2d 367, 371-72 (Tex.
1976).  These factors are neither required to be present in any particular case,
nor exclusive of other possible considerations.  See id. at 372.  The
Texas Legislature has also set forth a set of factors relevant to determining
best interest.  See Tex. Fam. Code § 263.307(b).  We will keep all of
the relevant factors in mind while assessing the evidence concerning best
interest.

            In
the present case, there was substantial evidence on which the factfinder could
have determined that termination was in M.G.’s best interest.  The initial
“intake report” to TDFPS alleged mental and physical neglect of M.G. by appellant. 
When appellant was telephoned regarding the report, she expressed concern about
a nonexistent twin of M.G., and she appeared unconcerned that M.G. was
“screaming and crying in the background.”  Appellant had previously refused
medical treatment for M.G. when he was a newborn and had failed to appear for
well-baby checkups.  Appellant was arrested when she kicked out bus windows
while M.G. was with her, an episode which the factfinder could have viewed as
highly dangerous, physically and mentally, to M.G.  There was considerable
evidence regarding appellant’s delusional thinking, which encompassed perceptions
of harm to M.G. as well as grandiose ideations.  Dr. D’Angelo, the psychologist
who evaluated appellant, concluded that her delusions might prevent her from
seeking medical attention for M.G. or from enrolling him in school and that
they could be detrimental to M.G.’s emotional development.  D’Angelo further expressed
concern that appellant did not comprehend her need for treatment or medication,
and he surmised that even supervised visitation could be harmful to M.G.  In
his evaluation, Dr. Valdes, the psychiatrist, stated that appellant “is likely
unable to carry out the duties of caring for her son at this time,” even though
at the time of the evaluation, appellant had been prescribed medication for her
mental problems.  There was also evidence that appellant was not taking her
medication as directed.  Regarding M.G. himself, Brewster, a TDFPS caseworker,
testified that M.G. was making considerable progress to normality while in
foster care.  There was testimony M.G. had bonded with his foster family. 
Brewster and others additionally noted problems occurring during appellant’s
visitations with M.G., including her treatment of him as a younger child and her
difficulty interacting with him.  Ross, Brewster’s TDFPS supervisor, worried
that M.G. would grow up “in the system” if appellant’s rights were not
terminated.  Lastly, several witnesses, including Slusher, Brewster, Ross, and
Stevens, detailed their professional experience in such cases and indicated
that termination was in M.G.’s best interest.  The ad litem representing M.G.
also concluded that termination was in M.G.’s best interest.  Based on this
evidence, a reasonable factfinder could have formed a firm belief or conviction
that termination was in M.G.’s best interest.  Accordingly, the evidence was
legally sufficient to support termination of appellant’s rights.

            There
was also some evidence that termination would not be in M.G.’s best interest. 
TDFPS investigator Harris said that when she first visited M.G., he appeared
healthy and was dressed appropriately for the weather.  Several witnesses
testified that appellant loved M.G. and that he appeared well kempt in her
care.  Appellant herself testified that she believed herself capable of raising
M.G.  Brewster acknowledged that if appellant obtained help for her mental
illness, stayed on her medication, and received support from her family, she
might be able to parent M.G., but he did not seem hopeful that any of these
conditions would occur.  Appellant’s aunt offered to help appellant and argued
that it would be best for M.G. to be with family.  She even offered to care for
M.G., although there was also testimony that when she previously did so, she
returned M.G. to appellant’s care without court or TDFPS approval.  Even in
light of this conflicting evidence, a reasonable factfinder could have formed a
firm belief or conviction that termination was in M.G.’s best interest. 
Consequently, the evidence was factually sufficient to support termination of
appellant’s rights.  We therefore overrule appellant’s second issue.

III. 
Assistance of Counsel

            In
her third issue, appellant contends that she did not receive effective
assistance of counsel in the trial court proceedings.  A parent in a parental
termination proceeding is entitled to effective assistance of counsel, a right
which is assessed under the same standard as that set for criminal defense
counsel in Strickland v. Washington, 466 U.S. 668, 681 (1984).  In re
M.S., 115 S.W.3d 534, 544-45 (Tex. 2003).  To demonstrate ineffective
assistance in a given case, a parent must first show that counsel’s performance
was deficient; once deficiency has been established, the parent must show that
counsel’s deficient performance prejudiced the parent’s case.  Id. at
545.  Concerning whether particular representation was deficient, we must
consider all circumstances surrounding the case and determine whether counsel
was “reasonably effective.”  Id.  In doing so, we provide great
deference to counsel’s performance, indulging “a strong presumption that
counsel’s conduct falls within the wide range of reasonable professional
assistance."  Id.  Only if counsel’s conduct is “so outrageous that
no competent attorney would have engaged in it,” will we find such performance
deficient.  Id.  In conducting the harm analysis under the second prong
of Strickland, courts must determine whether there is a reasonable probability
that, but for the deficient performance, the result of the proceeding would
have been different.  Id. at 550.  Any allegation of ineffective
assistance must be fully supported by the record.  Doe v. Brazoria County
Child Protective Servs., 226 S.W.3d 563, 572 (Tex. App.—Houston [1st Dist.]
2007, no pet.).

Appellant
contends that her counsel’s performance was deficient because counsel (1)
failed to object to certain State’s exhibits which were admitted into evidence
before trial; (2) failed to object to hearsay evidence and irrelevant evidence
during trial; and (3) failed to object to Dr. D’Angelo’s testimony regarding
the drugs prescribed for appellant.  Regarding the first allegation, the record
does not support the contention that counsel failed to object to the State’s
pre-admitted exhibits.  The record before us is silent as to whether counsel
objected when the exhibits were introduced pre-trial because such proceedings
do not appear in this record.  Regarding the other allegations, the record is
also completely silent as to trial counsel’s reasons for not objecting to the
various questions and answers of which appellant now complains.  Consequently,
it is impossible to determine whether the alleged failures were matters of
strategy or competency.  Indeed, matters of omission, such as the alleged
conduct here, are particularly ill-suited for review on direct appeal where
counsel’s reasoning has not been developed in the record.  See In re M.C.T.,
250 S.W.3d 161, 172 (Tex. App.—Fort Worth 2008, no pet.).  Because the record
is silent on these matters, appellant cannot overcome the presumption that
counsel’s performance was competent.  See In re K.M.H., 181 S.W.3d 1, 13
(Tex. App.—Houston [14th Dist.] 2005, no pet.); In re J.W., 113 S.W.3d
605, 616 (Tex. App.—Dallas 2003, pet. denied); see also Thompson v. State,
9 S.W.3d 808, 814 (Tex. Crim. App. 1999) (reversing court of appeals’ finding
of ineffective assistance because record did not reveal why counsel failed to
object to “State’s persistent attempts to elicit inadmissible hearsay”).  Accordingly,
we overrule appellant’s third issue.

IV. 
Conclusion

            Although
we believe that our resolution of the issues in this case was required by the
state of the law on parental rights terminations, we are nonetheless concerned
by how the result in this case was reached.  As detailed above, there was
evidence that appellant failed to comply with certain portions of court orders,
specifically dealing with consistent taking of her medication.  Under the law,
such failure was sufficient grounds for termination.  See Tex. Fam. Code
§ 161.001(1)(O).  However, it is troubling that there was no competent medical
testimony that consistent use of the prescribed medication was either necessary
for appellant to properly care for M.G. or would have been sufficient to enable
appellant to properly care for her child.  Consequently, appellant’s parental
rights may have been terminated for the failure to follow court orders potentially
unrelated to the parenting of M.G.  This precise issue is not before us. 
Nonetheless, we urge the legislature to consider adjusting the present scheme
for terminations so as to require that any court ordered requirements for
return of the child be rationally related to standards of acceptable parenting
and supported by competent evidence.[6]

            We
affirm the trial court’s judgment.

                                                                                    

                                                                        /s/        Adele
Hedges

                                                                                    Chief
Justice

 

Panel consists of Chief
Justice Hedges and Justices Seymore and Sullivan.









[1] Slusher
testified that the order required appellant to complete a psychological
evaluation and follow all recommendations.  The actual order states:
“[appellant] is ordered to:  psychological—follow all recommendations.”





[2] The trial court
terminated the parental rights of M.G.’s biological father in the same
proceeding, but the father neither participated in the trial below nor
participates in the present appeal.  The State sought termination of
appellant’s rights based on other grounds listed in section 161.001(1) of the
Family Code as well; however, the trial court only affirmatively found a
failure to comply with court orders under subsection 161.001(1)(O) in support
of the termination.  Tex. Fam. Code § 161.001(1).





[3]The portions of section 161.001
at issue in this case read as follows:

The
court may order termination of the parent-child relationship if the court finds
by clear and convincing evidence:

(1)
that the parent has:

.
. . .

(O)
failed to comply with the provisions of a court order that specifically
established the actions necessary for the parent to obtain the return of the
child who has been in the permanent or temporary managing conservatorship of
the Department of Family and Protective Services for not less than nine months
as a result of the child’s removal from the parent under Chapter 262 Error! Hyperlink reference not valid.for the abuse
or neglect of the child;

[and]

(2)
that termination is in the best interest of the child.

Tex. Fam. Code § 161.001





[4]Appellant’s aunt also testified
that appellant took her medication three times a week.





[5]
Other
than asking D’Angelo about whether he himself could dispense Abilify, trial
counsel did not seek to challenge D’Angelo’s testimony that Abilify must be
taken daily.





[6] Section
263.202(b) of the Family Code requires a trial court to review for
reasonableness TDFPS service plans, which as this case illustrates, often form
the basis of court ordered requirements for the return of children.  Tex. Fam.
Code § 263.202(b).  However, “reasonableness” is not defined in the code and
does not necessarily require that a service plan or resulting court orders on
which termination may be based include only requirements rationally related to
parenting.